The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 7, 2026

**2026 COA 35**

**No. 24CA0264, *In re Marriage of Lundin* — Family Law — Common Law Marriage — Marital Relationship — Totality of the Circumstances**

In this common law marriage case, a division of the court of appeals affirms the trial court's judgment determining that a common law marriage didn't exist between putative spouses notwithstanding that the parties had executed an affidavit — for the purpose of obtaining health insurance benefits — averring that they were common law married.

Applying *Hogsett v. Neale*, 2021 CO 1, and two companion cases issued the same day, the trial court found, based on the totality of the evidence before it, that the parties didn't have the mutual intent to be legally married when they signed the affidavit. On appeal, putative wife contends that the trial court erred by

failing to treat the parties' written agreement as dispositive of the question of whether a common law marriage exists.

Concluding that the trial court's factual findings are supported by the record and that the court properly applied controlling law, the division affirms.

The special concurrence raises concerns that, as applied to the facts of this case, *Hogsett*'s nondispositive treatment of the putative spouses' representations concerning whether they were common law married creates the risk of courts tolerating fraudulent or fraud-adjacent conduct.

Court of Appeals No. 24CA0264
Garfield County District Court No. 22DR30105
Honorable John F. Neiley, Judge

In re the Marriage of

Rochelle Leigh Hitchcock,

Appellant,

and

Kurt Alfred Lundin,

Appellee.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Kuhn, J., concurs
Schutz, J., specially concurs

Announced May 7, 2026

Law Office of Joel M Pratt, Joel M Pratt, Colorado Springs, Colorado, for Appellant

Defiance Law Firm, Peter A. Rachesky, Lara Horst, Glenwood Springs, Colorado, for Appellee

¶ 1     Rochelle Leigh Hitchcock appeals from the trial court's judgment determining that a common law marriage doesn't exist between her and Kurt Alfred Lundin.  The trial court reached this conclusion notwithstanding that the parties had executed an affidavit — for the purpose of obtaining health insurance benefits — averring that they had been common law married for a little more than five years.

¶ 2     On appeal, Hitchcock contends that the trial court erred by failing to treat the parties' written agreement as dispositive of whether a common law marriage exists.  The trial court, however, found — based on the totality of the evidence before it — that the parties didn't have the mutual intent to be legally married when they signed the affidavit.  It reached this conclusion by applying *Hogsett v. Neale*, 2021 CO 1, and two companion cases issued the same day.

¶ 3     Because we conclude that the court's factual findings are supported by the record and that the court properly applied controlling law, we affirm.

1

## I. Background

¶ 4    The parties lived together in Lundin's residence starting in 2016. In October 2022, the parties separated, and Hitchcock filed this action seeking the dissolution of an alleged common law marriage. Lundin moved to dismiss the dissolution petition on the grounds that the parties weren't married.[1]

¶ 5    Central to Hitchcock's contention that the parties are married at common law is an "Affidavit of Common Law Marriage," which the parties executed in 2021. In the affidavit, the parties represented that they held themselves out to the community as husband and wife, had a reputation in the community as husband and wife, and had lived together continuously as husband and wife since September 16, 2016. The affidavit also stated that Lundin and Hitchcock understood that in Colorado, a common law

---

[1] This case is entirely about the existence or nonexistence of a common law marriage. Neither party has ever contended that they entered into a licensed marriage under the Uniform Marriage Act, *see* §§ 14-2-101 to -113, C.R.S. 2025, and none of the analysis in this opinion has any bearing on how a court should determine the validity of a licensed marriage, *see Hogsett v. Neale*, 2021 CO 1, ¶ 31 & n.5 (recognizing that the common law marriage doctrine holds common law marriages "to standards that some licensed marriages might not meet if similarly scrutinized").

marriage "is valid for all purposes, the same as a ceremonial or civil marriage, and can only be terminated by death or divorce."

¶ 6     Based on the affidavit, Hitchcock moved for summary judgment as to the existence of a common law marriage.  The trial court denied the motion, concluding that, despite the affidavit, there were unresolved questions of material fact bearing on whether the parties were married.

¶ 7     After holding an evidentiary hearing on the existence of the parties' alleged common law marriage, the trial court issued a written order finding that the parties aren't married.  While the trial court considered the affidavit, it found that the parties didn't have the mutual intent to be legally married when they signed the affidavit.  This finding was based on testimony suggesting that the affidavit was executed to obtain health insurance for Hitchcock's diabetic son, who at the time was mere days away from losing health insurance coverage.  The court also reasoned that multiple other factors — such as the nature of the parties' cohabitation, their lack of a community reputation as spouses, and their lack of joint financial accounts — weighed against finding the existence of

a common law marriage.  Accordingly, the court dismissed Hitchcock's dissolution petition.

## II.    Common Law Marriage

¶ 8    Hitchcock contends that the trial court erred by concluding that she and Lundin aren't common law married.  We aren't persuaded.

### A.    Relevant Law

¶ 9    A party claiming the existence of a common law marriage bears the burden to prove it by a preponderance of the evidence. *See People v. Lucero*, 747 P.2d 660, 664 n.6 (Colo. 1987) (noting that a higher burden of proof isn't required, but "more than vague claims unsupported by competent evidence" must be presented), *abrogated on other grounds by*, *Hogsett*, 2021 CO 1; *see also* § 13-25-127(1), C.R.S. 2025 (burden of proof in any civil action shall be by a preponderance of the evidence).  "[A] common law marriage may be established by the mutual consent or agreement of the couple to enter the legal and social institution of marriage, followed by conduct manifesting that mutual agreement." *Hogsett*, ¶ 3. "The core query is whether the parties intended to enter a *marital* relationship — that is, to share a life together as spouses in a

committed, intimate relationship of mutual support and obligation." *Id.*

¶ 10    "In assessing whether a common law marriage has been established, courts should accord weight to evidence reflecting a couple's express agreement to marry.  In the absence of such evidence, the parties' agreement to enter a marital relationship may be inferred from their conduct." *Id.*  In performing this analysis, the court must consider all factors that might manifest the parties' agreement, or lack of agreement, to be married.  *In re Estate of Yudkin*, 2021 CO 2, ¶ 18.  Relevant factors include the parties' cohabitation, reputation in the community as spouses, maintenance of joint banking and credit accounts, purchase and joint ownership of property, filing of joint tax returns, evidence of shared financial responsibility, and evidence of joint estate planning.  *Hogsett*, ¶¶ 55-56.  These factors must be assessed in context, and the inferences to be drawn from the parties' conduct may vary depending on the circumstances.  *LaFleur v. Pyfer*, 2021 CO 3, ¶ 53.

¶ 11    The existence of a common law marriage depends on the totality of the circumstances, no single factor is dispositive.  *Yudkin*,

5

¶¶ 18-19; *see also Hogsett*, ¶ 59 (noting that the significance of a given factor will depend on the individual, the relationship, and the broader circumstances, including cultural differences). Thus, the determination of whether a common law marriage exists turns on issues of fact and credibility, which are firmly within the trial court's province to adjudge. *LaFleur*, ¶ 50; *see Hogsett*, ¶ 50 (Whether a common law marriage exists calls for "a flexible inquiry into the totality of the circumstances that relies on the factfinder's credibility determinations and weight of the evidence."); *In re Marriage of Lewis*, 66 P.3d 204, 207 (Colo. App. 2003) (recognizing that the weight, probative force, and sufficiency of the evidence, as well as the inferences and conclusions to be drawn therefrom, are within the trial court's sole discretion). To that end, "we review the court's factual findings for clear error and its common law marriage finding for an abuse of discretion." *LaFleur*, ¶ 50.

## B.    Discussion

¶ 12    Hitchcock argues that the trial court erroneously concluded that the parties aren't married because the court improperly discounted the affidavit, which she contends was determinative of the parties' marital status. Therefore, according to Hitchcock, the

6

trial court didn't need to consider any other evidence bearing on the existence or nonexistence of a common law marriage because the affidavit established that the parties were married as a matter of law.[2]

¶ 13    We reject Hitchcock's contention because she too narrowly construes the requirements of a common law marriage.

¶ 14    To begin, we understand Hitchcock's confusion, as the requirements for establishing a common law marriage are

---

[2] Hitchcock also argues that Lundin shouldn't be allowed to reap the benefits of a common law marriage (the extension of his employer's health insurance benefits to her son) without also bearing the consequences of a common law marriage (termination of the relationship only through divorce or death). This is essentially an estoppel argument — that is, Lundin should be estopped from maintaining a litigation position or presenting evidence that is contrary to the affidavit he executed and benefited from. *See People in Interest of S.N-V.*, 300 P.3d 911, 913 (Colo. App. 2011) ("Estoppel doctrines generally bar a party from asserting a claim or right that contradicts what that party has said or done before . . . ."). Hitchcock, however, didn't make an estoppel argument below, so the issue isn't preserved for our review. *See Hogsett*, ¶ 69 n.11 (declining to consider an "estoppel by contract" argument because it wasn't properly preserved in the trial court). As a result, we offer no opinion regarding whether invoking an estoppel doctrine before the trial court should or could have produced a different result.

undoubtedly complex.[3]  In *Hogsett*, the court repeatedly emphasized that the parties' intent to enter into a marital relationship is the principal question.  *Hogsett,* ¶¶ 3, 49-50 (characterizing the mutual consent and intention to marry as "[t]he core query," "[t]he key question," and "the centrality" of the analysis).  But the test articulated in *Hogsett* doesn't end there.  A common law marriage exists only if there was "mutual consent or agreement of the couple to enter the legal and social institution of marriage, *followed by* conduct manifesting that mutual agreement."  *Id.* at ¶ 3 (emphasis added).  Further, *Hogsett* unequivocally stated that "a mutual agreement to marry *does not alone suffice*; there must be some evidence of subsequent conduct manifesting that agreement."  *Id.* at ¶ 50 (emphasis added).

---

[3] Concurring only in the judgment in *Hogsett,* then-Chief Justice Boatright noted that the majority's approach "only further confuse[s] the already complex concept of common law marriage." *Hogsett,* ¶ 78 (Boatright, C.J., concurring in the judgment only). On this point, Chief Justice Boatright disagreed with the majority's articulated legal framework, opining that consideration of the factors for establishing a common law marriage should only be employed "when there exists credible disagreement as to the parties' intent." *Id.* at ¶ 80.  But this view didn't garner a majority of the court's votes.

¶ 15    Based on this reading of *Hogsett*, we must agree with the trial court that the affidavit alone couldn't establish the existence of a common law marriage because even though it evinces the parties' agreement that they are married, there still must have been subsequent conduct consistent with that agreement to marry. Thus, faithfully applying *Hogsett*, we must reject Hitchcock's suggestion that the affidavit itself — which was executed more than five years after the marriage was represented to have begun — definitively constituted, as a matter of law, both the agreement and the conduct manifesting that mutual agreement.

¶ 16    While Hitchcock points out that *Hogsett* also provided that "[i]n the *absence of* [an express agreement], the parties' agreement to enter a marital relationship may be inferred from their conduct," *id.* at ¶ 49 (emphasis added), we don't agree with Hitchcock's interpretation of that statement as a holding that an express agreement alone is sufficient to establish a common law marriage. Instead, we understand that statement to mean that conduct can demonstrate an implied agreement to be married when there is no express agreement. But still, a mutual agreement to enter into a marital relationship, whether express or implied, is only one

9

element; the common law marriage inquiry still requires subsequent conduct manifesting that mutual agreement. *See id.* at ¶ 50.

¶ 17 And Hitchcock hasn't cited any legal authority holding that a court *must* treat an express agreement to marry as the end of a common law marriage inquiry. To the contrary, at least one division of this court has reached the opposite conclusion. *See Whitenhill v. Kaiser Permanente*, 940 P.2d 1129, 1130-32 (Colo. App. 1997). In *Whitenhill*, the trial court had granted summary judgment after determining the existence of a common law marriage as a matter of law. *Id.* at 1132.

¶ 18 The division reversed, concluding that there was a genuine issue of material fact as to the existence of a common law marriage, even though the putative husband and wife had, in the course of obtaining medical treatment, signed an affidavit representing that they had lived together continuously as husband and wife and had held themselves out to the community as such. *Id.* at 1130-32. In reaching its conclusion that the affidavit didn't establish the existence of a common law marriage as a matter of law, the division noted that "[a] common law marriage is established by the mutual

consent or agreement of the parties to be husband and wife, *followed by* a mutual and open assumption of a marital relationship." *Id.* at 1132 (emphasis added). The division thus reasoned that, notwithstanding the affidavit, the party advocating for the existence of the marriage had "offered neither evidence of cohabitation nor of a general understanding in the community that the parties were husband and wife." *Id.*

¶ 19 And we aren't persuaded that *Hogsett* undermines the viability of *Whitenhill*. While *Whitenhill* predates the supreme court's modernization of the common law marriage factors in *Hogsett*, *Hogsett* didn't, contrary to Hitchcock's contentions, fundamentally change the test for determining whether a common law marriage exists. *See Hogsett*, ¶¶ 48-50 (modernizing the common law marriage factors identified in *Lucero*, 747 P.2d at 664). Indeed, *Hogsett*, ¶ 50, explained that its "refinement retains the core parts of the *Lucero* test: the centrality of the couple's mutual consent or agreement to marry, the requirement of some manifestation of that consent, and a flexible inquiry into the totality of the circumstances." Accordingly, *Hogsett* didn't abrogate *Whitenhill*.

11

¶ 20    Here, the trial court gave weight to the affidavit, which the court recognized "clearly states that the parties were married at common law." But in accordance with the requirement that there must be subsequent conduct manifesting the parties' mutual agreement, the court also weighed the numerous other factors bearing on the existence of a common law marriage and determined that those factors weighed against the existence of a common law marriage. *See Hogsett,* ¶¶ 55-56; *Whitenhill,* 940 P.2d at 1132. For example, the court found that while the parties initially shared an intimate relationship after moving in together in 2016, that relationship soon became more akin to a relationship of roommates, with the parties living in separate wings of the house. Similarly, the court credited multiple witnesses who testified that they never perceived the parties as married and that they believed the parties' relationship was largely platonic. And the court found that the parties didn't own any joint property or bank accounts, maintained only a single joint credit card at a home improvement store, never engaged in any joint estate planning, and never filed joint tax returns.

¶ 21    Hitchcock doesn't argue that those findings lack record support, and we conclude that the trial court acted within its discretion by weighing those findings against the affidavit. *See Hogsett,* ¶ 3.

¶ 22    We also reject Hitchcock's assertion that the trial court couldn't consider the intent of the parties and the circumstances surrounding the execution of the affidavit. Since the court was required to assess whether the parties in fact intended to enter a marital relationship by "shar[ing] a life together as spouses in a committed, intimate relationship of mutual support and obligation," *id.,* the parties' intent in executing the affidavit was relevant to the court's determination of the exitance of a marriage. *See also id.* at ¶ 31 ("[T]he inquiry is fact-intensive and invasive and forces judges to assess the degree to which a couple's conduct conforms to a marital ideal.").

¶ 23    Here, the trial court found, with record support, that the parties' intent in executing the affidavit, which was contained on a benefits form referencing the need to submit the document "to the plan administrator within [thirty] days," was to obtain health insurance for Hitchcock's soon-to-be uninsured child. Hitchcock

13

suggests the affidavit automatically resulted in a common law marriage because the parties intended to obtain — and appear to have actually obtained — a benefit of marriage in the form of health insurance for her son.  We disagree because the inquiry into a common law marriage is broader than that: it requires a finding that the parties intended to enter a marital relationship, which entails sharing a life together as spouses in a committed and intimate relationship.[4]  *Id.* at ¶ 3.

¶ 24     Therefore, we can't say that the trial court abused its discretion by considering, and then discounting, the affidavit based on its finding that the parties intended to obtain health insurance rather than enter into the multifaceted "legal and social institution of marriage."  *Id.*

¶ 25     Lastly, we reject Hitchcock's assertion that the trial court erred because it considered the wrong timeframe when assessing

---

[4] For the same reasons, we reject Hitchcock's suggestion that considering conduct other than the affidavit "sanctions fraud, or at least fraud-adjacent behavior."  Even if fraud were involved in signing the document, that conduct would be only one consideration for the court.  *See Hogsett,* ¶ 59.  It wouldn't make the affidavit the sole source of the court's determination or relieve the court from applying the rest of the *Hogsett* test.

the various factors indicative of a common law marriage. It's true that "conduct inconsistent with marriage that occurs as a relationship is breaking down does not negate a finding of common law marriage where there is evidence of the parties' earlier mutual agreement to be married." *Id.* at ¶ 57.

¶ 26 Here, however, the trial court assessed the parties' conduct following their commencement of cohabitation in 2016 and following their execution of the affidavit in 2021, with the court concluding that the conduct during both of those critical timeframes didn't support the existence of a common law marriage. With respect to the 2016 timeframe, the court found, with record support, that the parties' romantic relationship briefly resumed when Hitchcock moved in with Lundin sometime in 2016, but by 2017, the relationship had become platonic and remained that way for the duration of their cohabitation. Notably, the court observed that the parties' already platonic relationship didn't change in any meaningful way following the execution of the affidavit in 2021. And contrary to Hitchcock's contentions, we don't perceive any undue focus by the trial court on the parties' conduct at the time of their separation. Therefore, we are satisfied that the trial court

properly focused on the parties' conduct following their alleged agreement to marry, regardless of whether that agreement occurred in 2021, when they executed the affidavit, or in 2016, when they began cohabiting and the affidavit states the marriage began.

## III. Appellate Attorney Fees

¶ 27 Asserting that Hitchcock's appeal is without substantial justification and is otherwise frivolous, Lundin requests an award of his attorney fees incurred on appeal. *See* § 13-17-102, C.R.S. 2025. We, however, don't view Hitchcock's appeal as in any way frivolous. We therefore deny Lundin's request.

## IV. Disposition

¶ 28 The judgment is affirmed.

JUDGE KUHN concurs.

JUDGE SCHUTZ specially concurs.

JUDGE SCHUTZ, specially concurring.

¶ 29 Because it diligently adheres to the supreme court's opinion in *Hogsett v. Neale*, 2021 CO 1, ¶ 3, I concur with the result reached by the majority. I write separately, however, to amplify some uncertainty and discord that flows from the application of *Hogsett*'s holdings to the facts of this case.

¶ 30 The central uncertainty arises from Lundin's and Hitchcock's written representations that they were common law married in order to receive a financial benefit reserved for those who are married. The majority opinion does not treat the parties' written agreement that they were common law married as binding because of its reliance on the supreme court's holding in *Hogsett* that "a mutual agreement to marry does not alone suffice; there must be some evidence of subsequent conduct manifesting that agreement." *Id.* at ¶ 50 (citing *People v. Lucero*, 747 P.2d 660, 663 (Colo. 1987), *abrogated by*, *Hogsett*, 2021 CO 1). From there, the majority considers — like the trial court did— the additional *Hogsett* factors that focus on whether the putative spouses subsequently engaged in conduct manifesting their mutual intent to be married. All of that is consistent with *Hogsett*'s holding. *See id.* at ¶ 3. But the

17

application of these principles to Lundin's and Hitchcock's written representations raises significant concerns.

¶ 31    The parties' specific representation appears below:

CEBT    DATE FILED: February 10, 2023 3:01 PM
Affidavit of Common Law Marriage

1. We have lived together continuously, in Colorado, as husband and wife from ___9/16/16___ to the present;

2. We hold ourselves out to the community as husband and wife, consent to the marriage, cohabit and have a reputation in the community as being husband and wife;

3. We are eighteen years of age or older;

4. There is no legal impediment to our marriage. A legal impediment includes, but is not limited to a prior marriage of either party that has not been legally terminated by death or divorce, the parties are the same sex or the parties are closely related and would be prohibited under state law from marrying; and

5. We understand that a common law marriage, in the State of Colorado, is valid for all purposes, the same as a ceremonial or civil marriage, and can only be terminated by death or divorce.

We represent that the information contained herein is true and completed to the best of our knowledge; and that this agreement must be completed and submitted to the plan administrator within 30 days of the date entered in number 1 above. The effective date would be the date we started living together as husband and wife.

12/27/21

KURT A. LUNDIN
EMPLOYEE'S NAME (Please Print)                    EMPLOYEE'S SIGNATURE

EMPLOYEE'S SOCIAL SECURITY NO.                    EMPLOYER

Rachelle L. Hitchcock
SPOUSE'S NAME (Please Print)                      SPOUSE'S SIGNATURE

SPOUSE'S SOCIAL SECURITY NO.

MELODY LYNNE HARRISON
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20034003859
MY COMMISSION EXPIRES MARCH 1, 2023

*The Parties' Sworn "Affidavit of Common Law Marriage*

¶ 32    As illustrated, this was not a casual passing statement made between intimate partners. Rather, it was a sworn "Affidavit of

18

Common Law Marriage" that the parties represented was "true and completed to the best of [thei]r knowledge." They swore to these representations before a notary public. And in the affidavit, Lundin and Hitchcock expressly represented, "We understand that a common law marriage, in the State of Colorado, is valid for all purposes, the same as a ceremonial or civil marriage, and can only be terminated by death or divorce." By all accounts, Lundin and Hitchcock made this solemn representation to obtain a substantial financial benefit — insurance coverage for Hitchcock's son — that they were not entitled to unless they were married.

¶ 33    Thus, the result we reach by applying *Hogsett* to the facts of this case tolerates a situation in which both parties achieved a financial benefit by making a sworn representation that at least Lundin knew to be false, because — according to his testimony — he did not intend to be married. The majority excuses what it characterizes as potentially fraudulent conduct on the grounds that "[e]ven if fraud were involved in signing the document, that conduct would be only one consideration for the court." *Supra* ¶ 23 n.4. To support that conclusion, the majority again relies on *Hogsett*'s statement that the parties' stated intention in the affidavit is not

controlling, but rather is just one factor among many that the court must consider when determining whether the parties intended to be married. *See supra* ¶ 23 n.4. And indeed, *Hogsett,* ¶ 50, says, "[A] mutual agreement to marry *does not alone suffice*; there must be some evidence of subsequent conduct manifesting that agreement." (Emphasis added.)

¶ 34 But is the result in this case one that *Hogsett* actually contemplated? Or a result that the law should tolerate? I'm not so sure. The alleged common law marriage at issue in *Hogsett* did not involve a written commitment to marry, much less an agreement as detailed and specific as the affidavit here. Indeed, the trial court in *Hogsett* found credible evidence that one of the putative spouses did not believe she was married and the other putative spouse acknowledged this belief. *See id.* at ¶ 81 (Boatright, C.J., concurring in the judgment only). As then-Chief Justice Boatright noted, *Hogsett* presented a dispute where the putative spouses agreed that they had no verbal or written agreement to be married. *Id.* Nevertheless, the majority in *Hogsett* concluded that the undisputed absence of an agreement to marry was not dispositive, and it proceeded to expand the *Lucero* factors to ensure that the

additional judicial inquiries were made in a manner that appreciated the complexities of modern committed relationships. *See id.* at ¶ 83.

¶ 35    But the relationship between Lundin and Hitchcock requires the court to answer a materially different question: is an evaluation of the additional factors for assessing the existence of a common law marriage necessary or appropriate when the parties swear in writing that they are in a common law marriage?  Perhaps the answer to that question is, as we have concluded, "Yes."  But I am uncertain that *Hogsett* contemplated the type of sworn representation presented by this case.

¶ 36    In holding that the parties' agreement about whether they were common law married is not determinative, the court in *Hogsett*, ¶ 50, cited *Lucero*.  *Lucero* was a criminal case in which the defendant attempted to assert the existence of a common law marriage as a basis to invoke the marital privilege and prevent his longtime partner — and the mother of his child — from testifying against him.  *Lucero*, 747 P.2d at 662.

¶ 37    Thus, the question of whether a common law marriage existed was presented only in the context of an offer of proof made by

21

Lucero's criminal defense counsel through testimony from Lucero's partner. As part of that offer of proof, Lucero's partner testified that "she considered herself married to Lucero, and that the two of them held themselves out to friends as being married." She also affirmatively answered the question, "[D]o you know if [Lucero] agreed with your analysis that the two of you were married?" *Id.* (second alteration in original).

¶ 38    Based on this limited testimony, the trial court in *Lucero* found "that there was insufficient proof of a marital relationship." *Id.* It was in that procedural and factual context that the supreme court said the following:

> We affirm today that such conduct in a form of mutual public acknowledgment of the marital relationship is not only important evidence of the existence of mutual agreement but is essential to the establishment of a common law marriage. The reason for this requirement is to guard against fraudulent claims of common law marriage. As Professor Clark suggests in his treatise on domestic relations, "[a]dding the requirement of open marital cohabitation gives assurance that some objective evidence of the relationship will have to be introduced in every case to establish that the parties did consider themselves husband and wife."

*Id.* at 663-64 (quoting Homer H. Clark, Jr., *Law of Domestic Relations* 48 (1968)). So *Lucero* supports the notion that one alleged spouse's conclusory testimony that the parties intended to be married is not sufficient to prove a common law marriage. But it explained that such a requirement is necessary to prevent fraudulent assertions of a marital relationship.

¶ 39 In contrast to the conclusory evidence offered in *Lucero*, or the absence of an agreement presented in *Hogsett*, Lundin's and Hitchcock's affidavit was made in writing and delivered to third parties to obtain a financial benefit. Permitting the benefit to flow from such an affidavit — without enforcing its representation that a common law marriage exists — could reward arguably fraudulent conduct. That seems beyond, and perhaps inconsistent with, *Lucero*'s purpose of preventing fraudulent conduct, *id.* at 664, and the supreme court's long-established abhorrence of enforcing fraudulent agreements, *see, e.g., Armstrong v. Gresham,* 213 P. 114, 115-16 (Colo. 1923) ("An agreement to perpetrate a fraud on a third person is illegal and void.").

¶ 40 On the other hand, if the written unequivocal affidavit alone is sufficient to establish a common law marriage, that could also

result in a fraudulent or unjust result for one of the putative spouses. This case is illustrative of that point. If, as the trial court concluded, Lundin never intended to be married, treating the sworn statement as conclusive proof of a marriage would lead to a result in which he would be bound by all the burdens of marriage when that is not what he intended.

¶ 41     I suggest that clarification of how to apply *Hogsett*'s framework in circumstances such as these is warranted because — as previously explained — neither outcome is wholly palatable.

¶ 42     I acknowledge that the fraud issue was never presented to or decided by the trial court. Therefore, I concur with the majority's decision not to reach the merits of the potential fraud.[1] *See id.* But I also note that the parties' failure to raise the potential fraud issue is predictable because if they had done so, they risked the trial court making a finding that one or both of them had committed

---

[1] The division's decision to refrain from reaching the merits of the fraud question also amplifies the need to emphasize that nothing in the majority opinion or this special concurrence should be read to conclude that either Lundin or Hitchcock actually engaged in fraudulent conduct. Rather, my special concurrence addresses the *possibility* that the majority's holding and *Hogsett*'s holding could be interpreted to tolerate such a result.

fraud. Thus, the invocation of party presentation principles,[2] coupled with the parties' inherent disincentive to raise the issue, is likely to result in fraudulent — or at least fraud-adjacent — agreements not being squarely challenged. If that is so, future couples contemplating executing such agreements have little legal disincentive to engage in such conduct.

¶ 43    Addressing the fraud-related issues would not only strengthen the foundations of common law and statutory marriages, it would also discourage fraudulent conduct. But I nonetheless share the majority's conclusion that the trial court did not err by finding that Hitchcock failed to prove the existence of a common law marriage under the *Hogsett* framework. Accordingly, I respectfully concur.

---

[2] Party presentation principles are premised on the assumption that the parties know what is best for them and are obligated to advance the arguments that support their position, leaving courts in the role of neutral arbiters of the issues raised. *See Galvan v. People*, 2020 CO 82 ¶ 45.